Grabau, J.

INTRODUCTION

The Plaintiffs, Justin Teague and Jean Teague (the Teagues), the buyers of residential real estate, bring this civil action for specific performance, a violation of the covenant of good faith and fair dealing and a violation of the Consumer Protection Act, G.L.c. 93A. The Teagues contend that the Defendant, Paul M. Bisceglia (Bisceglia), the seller of residential real estate, breached the Purchase and Sale Agreement[1] at the closing by refusing to sign a Title Insurance Affidavit[2] which was required by the Teagues’ title insurance company, First American Title Insurance Company (First American). The Teagues further contend that Bisceglia’s failure to execute the Affidavit was contrary to industry practice and was a breach of the Purchase and Sale Agreement.
The Teagues desire to purchase the property and remain willing and able to close the real estate transaction with cash or certified funds without the benefit of mortgage financing.
Bisceglia contends in his Counterclaim that he complied with the requirements of Purchase and Sale Agreement by proffering the signed deed at the closing. Bisceglia further contends that the Teagues defaulted by failing to accept the deed and by failing to tender the purchase price at the closing. Bisceglia denies that he violated the covenant of good faith and fair dealing and contends that he is not in trade or business with *64 respect to the subject property. Bisceglia seeks forfeiture of Teagues’ deposit of $15,275.00 under the Purchase and Sale Agreement.[3]

FINDINGS OF FACT

Based on all of the evidence which I find to be credible, drawing such fair inferences as I find to be reasonable, I find the following material facts.
1. On April 25, 2000, the Teagues submitted an offer to purchase the residential property at 122 Foster Avenue, Marshfield, Massachusetts for $305,500.00. The offer to purchase was accepted by Bisceglia, through his agent, Harbor Realty, on April 25, 2000.
2. On May 7, 2000, the Teagues and Bisceglia entered into a Purchase and Sale Agreement for the purchase of the residential property by the Teagues. Both parties were represented by counsel in the negotiation and execution of the Purchase and Sale Agreement. Pursuant to Paragraph 8 of the Purchase and Sale Agreement, the closing was to take place at 1:00 p.m. on August 11, 2000, at the Plymouth County Registry of Deeds. It was agreed by the parties that “time is of the essence of this Agreement.” Bisceglia was aware that the Purchase and Sale Agreement contained a mortgage financing contingency. The Teagues obtained a Mortgage Pre-Approval Letter[4] and loan Commitment[5] which was subject to the property being appraised.
3. Paragraph 9 of the Purchase and Sale Agreement provides that the Teagues had the right to inspect the property prior to the delivery of the deed. On August 11, 2000, the Teagues arrived at 122 Foster Avenue to inspect the property. Bisceglia was not present. The Teagues were therefore not able to inspect the property. Bisceglia agreed, during the closing, that in order to satisfy the Teagues, they could walk through the property prior to any funds being disbursed, after the signing of the papers, and before the deed was recorded. This arrangement was acceptable to the Teagues.
4. Paragraph 4 of the Purchase and Sale Agreement obligates Bisceglia, to convey the property “by a good and sufficient deed” to the Teagues, such deed conveying a “good and clear record and marketable title thereto, free from encumbrances except...” Bisceglia was also obligated to deliver a smoke detector certificate under Paragraph 29 and a certification that there was no urea formaldehyde foam insulation in the property under Paragraph 32[6] of the Purchase and Sale Agreement at the time of the closing.
5. Paragraph 34 of the Purchase and Sale Agreement provides that:
It shall be a condition of BUYER’S obligation to purchase the premises that at the time of performance, BUYER can obtain an owner’s policy insuring title to the premises in the BUYER, free of encumbrances except as set forth in clause 4 of this Agreement and standard exceptions and other exceptions such as are routinely taken in an ALTA owner’s policy, issued by a title insurance company licensed to do business in Massachusetts.
6. On August 11, 2000, the Teagues, as Buyers, elected at the closing not to purchase owner’s title insurance.[7]
7. On August 11, 2000, at 1:00 P.M., all parties appeared at the Plymouth County Registry of Deeds to close the transaction. At the closing, Bisceglia, was presented for the first time with a document entitled Title Insurance Affidavit (Affidavit). The Affidavit required Bisceglia to state “under oath” and “under the penalties of perjury” that 1) there was no amount due to any person who provided labor or materials for work on the property during the 93 days prior to and including the day of closing; 2) at the date of the closing there were no tenants or other parties who are in possession or'who have the right to be in possession of said property; 3) neither the property nor any use thereof is in violation of restrictive covenants, if any, affecting the property; 4) all bills from municipal light plant service charges which could become liens have been paid; and 5) no security interest which secures payment or the performance of any obligation has been given by the undersigned, or to the knowledge of the undersigned, in any personal property or fixtures placed upon or installed on said property. The Affidavit also sets forth that it was made “for the purpose of inducing the Title Insurance Company to insure the mortgage on said property and the undersigned agrees to indemnify and hold harmless the Title Insurance Company from any loss resulting from reliance upon the truth and accuracy of the statements contained herein.”[8]
8. Bisceglia proffered an executed deed, but declined to execute the Affidavit, as requested by the Attorney Lisa Dropkin of the firm of Kushner, Sanders & Krone, LLP, the closing attorney and settlement agent. Attorney Dropkin informed Bisceglia and his attorney that the'Affidavit was necessary to provide exception-free title insurance to the secondary market lender to which the loan would be assigned. Consequently, Attorney Dropkin declined to authorize the disbursement of the proceeds. The closing did not occur.
9. Prior to the closing, a letter[9] was sent to the Teagues to inform them about the closing process. Attached to the letter was another document entitled “Attachment to Letter” which indicates that Kushner, Sanders & Krone, LLP would be certifying title to the Teagues pursuant to G.L.c. 93, §70. The certification was to include “a statement that at the time of recording the said mortgage, the mortgagor holds good and sufficient record title to the mortgaged premises free from all encumbrances, and shall enumerate exceptions thereto.” The certification excluded the same items set forth as exclusions in Paragraph 4 of the Purchase and Sale Agreement.
*65 10. Neither First Financial, Inc. (First Financial),[10] the Teagues’ lender, nor First American, the Teagues’ title insurance company, nor the lender’s attorney, ever disclosed to the Teagues that a condition to the closing would be obtaining a signed Title Insurance Affidavit from Bisceglia.[11]
11. Neither the Teagues nor their attorney ever informed Bisceglia in advance of the closing that he would be required to sign the Affidavit. The Purchase and Sale Agreement did not mention the Affidavit.
12. None of the documents[12] sent to the Teagues by the law firm of Kushner, Sanders & Krone, LLP, which represented First Financial, informed and/or required the Teagues to insist that Bisceglia convey “a good and clear and marketable title” as stated in the Purchase and Sale Agreement or that the Teagues provide for such language when their attorney drafted the Purchase and Sale Agreement.
13. First American did not provide Bisceglia with consideration for the indemnification provision contained in the Title Insurance Affidavit sought by First American, the title insurance company.
14. A Title Insurance Affidavit is not a title document. It is not an industry practice to expect a seller of residential property to sign a Title Insurance Affidavit for the benefit of the lender and/or the title insurance company without such a provision in the Purchase and Sale Agreement.
15. The mortgage commitment that the Teagues received from First Financial, Inc. expired on August 11, 2000. Paragraph 10 of the Purchase and Sale Agreement provided for a 30-day extension to allow the Teagues to perfect title, if necessary, and if the proper notice was given by Bisceglia. There was no defect of title on August 11, 2000, therefore, there was no basis to invoke the extension provision in Paragraph 10 of the Purchase and Sale Agreement.
16. On or about August 30, 2000, the Teagues sent Bisceglia a demand letter describing his unfair and/or deceptive acts and/or practices, outlining the applicable provisions of G.L.c. 93A, and demanding relief.
17. On or about September 14, 2000, the Teagues received a letter from Bisceglia dated September 13, 2000. Bisceglia did not offer to settle the claims alleged by the Teagues.
18. The Teagues breached the Purchase and Sale Agreement when the closing attorney and settlement agent demanded for the first time that Bisceglia execute the Affidavit as a condition of the mortgage loan.
19. Paragraph 21 of the Purchase and Sale Agreement provides for liquidated damages in the event of Teagues’ default. The liquidated damages provision of the Purchase and Sale Agreement is fair and reasonable. The amount of the deposit held by Bisceglia’s broker was $15,275.00.[13]

RULINGS OF LAW

Based on the foregoing Findings of Fact, I make the following Rulings of Law.
The terms of the Purchase and Sale Agreement were unambiguous. The Purchase and Sale Agreement contained an integration clause stating that the agreement reflected the entire agreement of the parties. Bisceglia complied with all of his obligations under the Purchase and Sale Agreement.
At the closing, Bisceglia offered to hold the lender’s disbursement until the walk-through was completed by the Teagues. Bisceglia was ready to tender a quitclaim deed at the closing. Bisceglia had no legal obligation under the Purchase and Sale Agreement to sign the Title Insurance Affidavit that was presented to him at the closing. ATitle Insurance Affidavit is not a title document.
There was no consideration running from the Teagues and/or First Financial and/or First American to Bisceglia in exchange for the indemnification sought from him in the Affidavit.
There is nothing implicit in the Purchase and Sale Agreement at issue herein that required the seller to execute any loan documents as a condition for the buyers to obtain financing. The mortgage contingency contained in the Purchase and Sale Agreement is for the benefit of the Teagues and does not require them to obtain any particular type of mortgage nor does it require Bisceglia to satisfy any requirements that a buyer’s lender, e.g. First Financial, may have which a seller is not otherwise required to perform.
The term “marketable title” has little or no meaning under the circumstances of this case. As stated in Mishara v. Albion, 341 Mass. 652 (1961), “(T]he test of marketability is whether the title is good beyond a reasonable doubt. [Citations omitted.) The doubt is ‘such as would cause a prudent man to pause and hesitate before investing his money.’ First African Methodist Episcopal Soc. v. Brown, 147 Mass. 296, 298. The title must be ‘free from obvious defects, and substantial doubts.’ O’Meara v. Gleason, 246 Mass. 136, 138. But a mere possibility of a defect in title will not relieve the purchaser from liability under his contract. Ryder v. Garden Estates, Inc., 329 Mass. 10, 12, and cases cited.”
At the closing, Bisceglia agreed to give the Teagues access to the property prior to the disbursement of funds. The Teagues agreed to Bisceglia’s proposal. There was no evidence presented at the trial to show that Bisceglia was not able to convey an “indefensible unencumbered estate." O’Meara v. Gleason, 246 Mass. 136, 138.
Bisceglia did not breach the Purchase and Sale Agreement or the implied covenant of good faith and fair dealing. Bisceglia did not violate G.L.c. 93A.

ORDER

Based on the forgoing Findings of Fact and Rulings of Law, it is ORDERED that Judgment enter for the *66 Defendant, Paul M. Bisceglia, on the Plaintiffs’ Amended Complaint. It is further ORDERED that Judgment enter for the Defendant, Paul M. Bisceglia, on his Counterclaim against the Plaintiffs, Justin Teague and Jean Teague, in the amount of $15,275.00.[14]

Exhibit 2, Paragraph 7.

Exhibit 3.

Exhibit 2, Paragraph 21.

Exhibit 12.

Exhibit 13.

Exhibit 14.

Exhibit 5.

Ihe Teagues signed an “Occupancy Statement” (Exhibit 6) in which they certified that the mortgage loan was to finance the “purchase of a home to be used as our principal residence with occupancy to begin within 30 days after close of escrow . . .” Contrary to the Teagues’ Affidavit, they intended to use the property during their summer vacations and not as their primary residence. (Exhibit 19.)

The letter was sent by Kushner, Sanders & Krone, LLP and was dated July 14, 2000. Exhibit 4.

Neither Exhibit 10, “Closing Attorneys and the Closing Process-What you should Know,” nor the Loan Commitment of First Financial (Exhibit) 13), mention the requirement of the seller signing a Title Insurance Affidavit.

Neither First Financial, Inc. (First Financial), the Teagues’ lender, nor First American, the Teagues’ title insurance company, nor the lender’s attorney, ever disclosed to the Teagues that a condition to the closing would be obtaining a signed Title Insurance Affidavit from Bisceglia. The law firm of Kushner, Sanders & Krone who represented First Financial, Inc., failed to advise the Teagues in the July 14, 2000 letter (Exhibit 4) that the title insurance company required Bisceglia to sign the Affidavit. (Exhibit 3.) Had the Teagues been informed in a timely manner, either by the First Financial or First American, the buyers could have included such a provision in the Purchase and Sale Agreement.

Exbibits 4, 10 and 13. The Loan Commitment, Exhibit 13, contained a provision requiring that an unused, above-ground oil tank be removed prior to the appraisal. Bisceglia removed the oil tank.

Paragraph 7 of the Purchase and Sale Agreement.

This is the amount specified in the Purchase and Sale Agreement as liquidated damages.